Paul F. FUNSTON, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. No. 79–1481.

United States District Court, M. D. Pennsylvania.

May 11, 1981.

Peter T. Campana, Williamsport, Pa., for plaintiff.

Carlon M. O'Malley, U. S. Atty., Scranton, Pa., Mary L. McElroy, Trial Atty., Torts Branch, Civil Division, U. S. Dept. of Justice, Washington, D. C., Harry Nagle, Asst. U. S. Atty., Lewisburg, Pa., for defendant.

## OPINION

MUIR, District Judge.

### I.  Introduction.

In this action brought under the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq. and the National Swine Flu Immunization Program of 1976, Pub.L.No.94–380, § 2, 90 Stat. 1113 (1976) codified at 42 U.S.C. § 247b(k)(2)(A) before the enactment of Pub.L.No.95–626, § 202, 92 Stat. 3551 (1978), Paul F. Funston seeks damages from the United States as a result of injuries caused by the Guillain-Barre Syndrome suffered by Funston following the administration of a swine flu vaccination.  Jurisdiction is based on 28 U.S.C. § 1346(b).  Prior to the trial of this action, a claim by Shirley M. Funston, Paul Funston's wife, for damages she suffered as the result of her husband's affliction was dismissed because of her failure to file a timely administrative claim as required by 28 U.S.C. § 2675(a). The Government has stipulated that the Guillain-Barre Syndrome exhibited by Paul Funston was caused by the swine flu inoculation and that the Government is liable to

Mr. Funston. A trial to the Court on the issue of damages was held on April 14 and 15, 1981 and because of a misunderstanding between counsel as to whether Paul Funston's work life expectancy had been stipulated which did not surface until closing arguments, further evidence on that issue was taken on April 22, 1981. The following constitute the Court's findings of fact, discussion, and conclusions of law.

## II. Findings of Fact.

1. The Plaintiff filed the appropriate administrative claim on August 15, 1978.

2. The Plaintiff's administrative claim was deemed denied on February 15, 1979.

3. This action was commenced on December 4, 1979.

4. The President of the United States on March 24, 1976, announced that he was recommending to Congress a mass vaccination program for all Americans to combat the swine influenza virus. (Undisputed finding of fact, hereinafter designated "U").

5. Congress passed a Special Appropriations Bill of $135,064,000.00 for the purchase of swine flu vaccine and the administration of the program to distribute it, and the President signed the Bill on April 15, 1976. Pub.L. 94–266, 90 Stat. 363 (1976). (U)

6. On August 12, 1976, Congress passed the National Swine Flu Immunization Program of 1976 Pub.L. 94–380, 90 Stat. 1113 (1976), codified at 42 U.S.C. § 247b(j)–(*1*) until the enactment of Pub.L. 95–626, § 202, 92 Stat. 3551 (1978). (U)

7. The Swine Flu Immunization Program was established, conducted, and supported by the Department of Health, Education and Welfare. (U)

8. The Government executives within HEW, who are responsible for making the decisions concerning the establishment, conduct, and support of the Swine Flu Program, were the Assistant Secretary for Health, the Director of the Center for Disease Control, the Director of the Bureau of Biologics, and the Deputy Director of the National Institute of Allergies and Infectious Diseases. (U)

9. The mass inoculation of the American public began on October 1, 1976. (U)

10. The United States assumed the sole responsibility for informing potential recipients of the vaccine of the risks and benefits of receiving swine influenza vaccine. 42 U.S.C. §§ 247b(j)(1)(F) before its amendment by Pub.L. 95–626.

11. The personnel at the Center for Disease Control were responsible and developed the informed consent form which was required to be used to advise potential recipients of the vaccine of the risks and benefits of receiving swine influenza vaccine. (U)

12. The Bureau of Biologics was responsible for and developed the package insert circulars that were included with each package of swine influenza vaccine distributed. (U)

13. The manufacturers of swine flu vaccine sold all of the vaccine to the United States. (U)

14. The United States controlled the distribution of the swine flu vaccine. (U)

15. On November 2, 1976, at approximately 2:30 P.M., the swine flu vaccine was administered to Paul F. Funston, the Plaintiff, under the Swine Flu Immunization Program. The vaccine was injected into him at the Muncy Senior High School, Muncy, Pa., under the sponsorship of the Pennsylvania Department of Health. (U)

16. On the day of the shot Plaintiff's arm swelled and itched, his toes severely tingled and the tip of his tongue tingled. On the next two days the Plaintiff could not control his fingers properly. During this period Plaintiff did not experience any pain.

17. As a result of the inoculation referred to above, Paul F. Funston sustained Guillain-Barre Syndrome. (U)

18. Symptoms of Guillain-Barre Syndrome are a deficiency in sensation and of motor abilities starting at the extremities and ascending the arms and legs to the torso involving a danger to the respiratory muscles and a potential for death.

19. There is no known cure for Guillain-Barre Syndrome other than supportive treatment.

20. Some victims of Guillain-Barre Syndrome completely recover.

21. As a result of the Swine Flu inoculation of November 2, 1976, Paul F. Funston developed Guillain-Barre Syndrome on or about November 26, 1976.

22. As a result of the onset of the Guillain-Barre Syndrome Paul F. Funston was admitted to the Divine Providence Hospital in Williamsport, Pennsylvania on November 26, 1976 where he remained until December 13, 1976.

23. While Plaintiff, Paul F. Funston, was in the Divine Providence Hospital he was placed in the Intensive Care Unit until such time as the treating physicians no longer considered the possibility that the Guillain-Barre Syndrome would cause his death.

24. During the time he was in intensive care, Plaintiff was paralyzed even to the extent of being lagopthalmic.

25. Plaintiff was incapable of feeding himself until December 25, 1976 when he was able to bring a piece of fruit to his mouth.

26. On December 13, 1976 Paul F. Funston was transferred to the Williamsport Hospital where he was kept until January 28, 1977.

27. After recovering from his paralysis and until the time of trial Paul F. Funston has been continually affected by the residual paraparesis caused by the Guillain-Barre Syndrome.

28. Paul F. Funston was born September 28, 1934.

29. Mr. Funston is a sheet metal lay out man by occupation. He was employed by Koppers Sprout-Waldron in that capacity from 1955 until November 1976.

30. Because of the residual effects of the Guillain-Barre Syndrome Paul Funston was placed on disability retirement by his employer, Koppers Sprout-Waldron, On October 28, 1977.

31. On or about May 8, 1978, Mr. Funston attempted to return to work at Koppers Sprout-Waldron but was unable to perform his previous job because of residual effects of the Guillain-Barre Syndrome.

32. Plaintiff was unable to perform a clerical job provided for him on May 8, 1978 and ceased working on May 10, 1978, when he collapsed and was taken to the hospital in an unconscious condition.

33. As a result of the Guillain-Barre Syndrome Paul Funston has been unable to perform his ordinary and usual occupation as a sheet metal layout man from November 26, 1976 until the date of trial. (U)

34. There is no known cure for the residual symptoms of Guillain-Barre Syndrome from which Mr. Funston presently suffers.

35. It is highly doubtful that Mr. Funston will regain normal strength in his legs and torso even with an exercise program.

36. The only type of occupation that Mr. Funston was physically capable of performing at the time of trial and will be able to perform for the remainder of his life would be a clerical type job in a dust free environment at which he could sit, stand, or walk at his option and would not be required to lift any substantial weight with regularity.

37. Plaintiff has marketable skills and the intelligence to enter one or more of the following semi-skilled jobs: receiving clerk, shipping clerk, dispatch clerk, inventory clerk, warehouse clerk, rate clerk.

38. Skills which Mr. Funston developed in his position with Koppers Sprout-Waldron would not be readily transferrable to such positions.

39. Mr. Funston's excellent employment record for one employer over 22 years enhances his employability.

40. The Federal "Target on Jobs, Tax Credit Program" whereby an employer may obtain a $3,000 tax credit for employing each handicapped worker also enhances the Plaintiff's employability despite his partial disability and age.

41. With vocational counseling, selective placement and on the job training, the Plaintiff is employable.

42. Return to gainful productive activity would be psychologically and emotionally beneficial to counter Plaintiff's present reactive depression and loss of self-esteem.

43. Because of the degree of physical limitation which presently exists and will continue to exist in Paul Funston and because of his easy fatigueability Paul Funston would be unable to meet the production requirements at entry level in other unskilled positions.

44. Paul Funston has been totally disabled as a result of the Guillain-Barre Syndrome through 1980 and will be partially disabled for the remainder of his life.

45. Paul Funston retains one-half of his earning capacity.

46. Plaintiff regained one-half of his former earning capacity as of January 1, 1981.

47. Paul Funston's life expectancy is 26.9 years.

48. Paul Funston's work-life expectancy is 17.2 years.

49. Prior to November 1976 in addition to working at Koppers Sprout-Waldron Paul Funston was also engaged in a family-operated business of preparing and selling trailers at which he worked an average of six hours a day after finishing his day's work at Koppers Sprout-Waldron.

50. As a result of the residual effects of the Guillain-Barre Syndrome Paul Funston is no longer physically capable of engaging in the family-operated business to the extent he was formerly able to do so.

51. As a result of the Guillain-Barre Syndrome, Paul Funston has undergone great pain and suffering, both physical and mental, from November 1976 until the time of trial.

52. As a result of the Guillain-Barre Syndrome, Paul Funston will suffer great pain and suffering, both physical and mental, for the remainder of his life.

53. As a result of the Guillain-Barre Syndrome Paul Funston has incurred medical bills in the amount of $10,310.37.

54. Mr. Funston's last day of employment prior to onset of Guillain-Barre Syndrome was November 19, 1976.

55. A general pay increase which would have resulted in an increase in Plaintiff's pay had he not suffered Guillain-Barre Syndrome to $6.63 per hour was granted on October 31, 1977.

56. A merit increase was granted Mr. Funston on November 29, 1976, to an hourly rate of $6.11. This was Mr. Funston's only merit increase since 1973.

57. Other employees with similar longevity and experience received additional increases to the following hourly rates: November 6, 1978, $7.08; April 3, 1979, $7.27; October 8, 1979, $8.00; October 8, 1980, $8.76.

58. As a result of his inability to work at Koppers Sprout-Waldron, Paul Funston has suffered lost wages in the amount of $59,526.10 from the date of the onset of the Guillain-Barre Syndrome until the date of trial.

58.1 The amount of lost wages is calculated by multiplying the following number of hours by the following hourly rates for each year indicated:

| Year | Hours | | Rate | | Amount |
|---|---|---|---|---|---|
| 1976 | 200 hours | at | $6.11 | = | $1,222.00 |
| 1977 | 1760 hours | at | $6.11 | = | $10,753.60 |
| | 320 hours | at | $6.63 | = | $2,121.60 |
| 1978 | 1800 hours | at | $6.63 | = | $11,934.00 |
| | 280 hours | at | $7.08 | = | $1,982.40 |
| 1979 | 40 hours | at | $7.08 | = | $283.20 |
| | 1520 hours | at | $7.27 | = | $11,050.40 |
| | 520 hours | at | $8.00 | = | $4,160.00 |
| 1980 | 1560 | at | $8.00 | = | $12,480.00 |
| | 520 hours | at | $8.76 | = | $4,555.20 |
| 1981 until 4/14/81 | 600 hours | at | $8.76 | = | $5,256.00 |

| | | |
|---|---|---|
| Total | = | $65,798.40 |
| Less adjustment for 1981 | | (2,628.00) |
| Less adjustment for vacation pay | | (3,644.30) |
| Total lost wages until April 14, 1981 | | $59,526.10 |

58.2. The total for 1981 was reduced by ½ to $2628.00 because of the Court's finding that Mr. Funston's earning capacity was reduced by ½ after December 31, 1980. The total for 1976 until April 14, 1981 was further reduced by 5.769% or $3644.30 to reflect the fact that Mr. Funston was entitled to three weeks paid vacation each year.

59. Fringe benefits associated with Mr. Funston's job at Koppers Sprout-Waldron have a value of 35% of the gross wages paid.

60. As a result of his inability to perform his job at Koppers Sprout-Waldron, Paul Funston has lost fringe benefits associated with his occupation in the amount of $20,834.13 from the onset of the Guillain-Barre Syndrome until the time of trial.

61. If Plaintiff were able to perform his usual occupation at Koppers Sprout-Waldron, he would have earned for the remainder of his work-life expectancy wages of $295,317.12, arrived at by multiplying an hourly rate of $8.76 by 49 forty hour weeks for 17.2 years.

62. If Plaintiff were able to perform his usual occupation at Koppers Sprout-Waldron, he would have earned fringe benefits valued at 35% of lost future wages or $103,-360.99 for the remainder of his work-life expectancy.

63. Fair compensation for the loss of Plaintiff's earning capacity is $199,339.05, arrived at by reducing by ½ the total of lost future wages and fringe benefits.

64. Fair compensation for Plaintiff's pain and suffering is $200,000.00.

65. Fair compensation for Plaintiff's medical expenses is $10,310.37.

### III. Discussion.

The fate that has befallen Paul Funston can only be described as tragic. At the age of 42 while in excellent health and working 15 hours a day at two jobs and using his leisure time for hunting, swimming, and water skiing, he was stricken with Guillain-Barre Syndrome. He was at one point near death. While in the hospital he suffered nearly total paralysis and extreme pain. He could control none of his muscles; he could not control his excretory organs, arms, fingers, legs, and toes. His eyeballs rolled back into his head. The nurses had to close his eyes. Since his release from the hospital Paul Funston has regained full strength in his arms but retains substantial weakness in his legs and torso. He still experiences pain and the suffering and humiliation of not being the complete person he once was. Throughout this time Paul Funston has suffered from depression even to the point of considering suicide. It is now the Court's task to determine what amount of money will fairly compensate Paul Funston for his medical expenses, past lost earnings, lost future earning capacity, and pain and suffering.

■ The Court's determination that Paul Funston is entitled to $10,310.37 for medical expenses is based on the uncontradicted bills admitted into evidence. The Government has not contended that any of those amounts were unreasonable or unnecessary and the Plaintiff has not sought an award for future medical expenses; consequently, full compensation for the bills admitted into evidence is appropriate.

■ Plaintiff's request for damages to compensate him for lost past earnings and for lost future earning capacity is based on his contention that he is completely disabled and will remain so for the remainder of his life. In calculating the appropriate compensation, the Court must determine whether and to what extent there has been "a loss of earning power and of ability to earn money." More is involved than comparing the amount earned before and after the injury. *Mazi v. McAnlis*, 365 Pa. 114, 121, 74 A.2d 108 (1950). The test is whether "the economic horizon of the [Plaintiff] has been shortened because of the injuries...." *Holton v. Gibson*, 402 Pa. 37, 44 (1960). Based on the medical testimony, particularly that of Dr. Sutliff, the Court concludes that while Mr. Funston's earning capacity has been impaired, it has not been extinguished.

■ Plaintiff enjoys full strength in his arms although his torso and legs are still weaker than normal and in all probability that weakness will continue for the rest of his life. Even with these physical limitations, based on the testimony of Mr. Van Raay, the Court concludes that there are several types of clerical jobs that the Plaintiff is physically capable of performing and for which he has the necessary skills. Because of Mr. Funston's age, education, and disability, the Court is not convinced that he retains the ability to earn as much as he would have earned had he not contracted Guillain-Barre Syndrome. After considering the testimony of the doctors, vocational experts and the Plaintiff the Court concludes that Mr. Funston retains one-half of his earning capacity.

Based on the proposed finding of fact submitted by the Government, it appears that the Government concedes that Mr. Funston was totally disabled until the end of 1980. This is consistent with Dr. Sutliff's testimony that Mr. Funston did not regain deep tendon reflexes in his legs until approximately that time and the Court finds independently of the Government's concession that Mr. Funston was totally disabled from employment until December 31, 1980 and after that date regained one-half of his earning capacity. The Court does not imply by this conclusion that on December 31, 1980, Mr. Funston was totally disabled and on January 1, 1981 regained one-half of his earning capacity; rather, the Court concludes that January 1, 1981 constitutes a reasonable point at which to draw the line between total disability and partial disability.

■ Plaintiff seeks an award in excess of that sought in his administrative claim. This is permissible only if the request is based on newly discovered evidence or upon "allegation and proof of intervening facts relating to the amount of the claim." 28 U.S.C. § 2675(b). Plaintiff's administrative request sought $450,000.00 which was broken down into claims for lost earnings, pain and suffering and the like. The Government argues that not only is Mr. Funston

bound by the aggregate of his claim, he is also bound by the various subdivisions of his claim. The Court cannot accept this contention because it is contrary to the clear language of the statute which says that the Plaintiff may not request "any sum in excess of the amount of the claim presented to the federal agency, except where the increased amount is based . . . upon allegation and proof of intervening facts relating to the amount of the claim." The statute says nothing about component parts of a claim.

The Plaintiff argues that the decision of the Supreme Court of Pennsylvania in *Kaczkowski v. Bolubasz*, 491 Pa. 561, 421 A.2d 1027 (1980), constitutes an intervening fact relating to the amount of the claim. In that case the Supreme Court of Pennsylvania held that in the future a plaintiff would be entitled to a recovery for lost future earning potential that included the effects of inflation. The Court further held that as a matter of law those effects would exactly offset the interest that an award would earn. As a result, once the damage for lost future earnings is calculated, it would not be discounted. The Pennsylvania Supreme Court's decision is, in this Court's view, a fact relating to the amount of the claim and, therefore, the Plaintiff is entitled to seek an amount in excess of his administrative claim but only to the extent that the increase is applicable to the fact that in submitting the administrative claim Plaintiff discounted his request for lost future earnings as required by then applicable law. The difference between Plaintiff's claimed lost future earnings and the commuted value of those claimed earnings was shown in his administrative request to be $88,622.94; consequently, Plaintiff may, consistent with 28 U.S.C. § 2675(b), seek an award of $450,000 plus $88,622.94 or $538,622.94.

■ The Court calculated Plaintiff's lost wages until the time of trial by using the hourly wage rates of an employee at Sprout-Waldron who was situated similarly to the Plaintiff. The Court assumed that the Plaintiff would have worked a 40-hour week and the hourly rates were multiplied

accordingly. Because Plaintiff was entitled to three weeks a year of paid vacation and the value of that benefit is included in the compensation for loss of fringe benefits, the total obtained by multiplying the hourly rates by the number of hours worked was reduced by 5.769%. Since the Court has determined that Mr. Funston was unable to work until December 31, 1980 and that after that date he retained one-half of his earning capacity, the award for lost wages from January 1, 1981 to the time of trial was calculated at ½ of the wage Mr. Funston probably would have earned at Sprout-Waldron.

■■■ The Court agrees with the Plaintiff's contention that he is entitled to compensation for the value of his fringe benefits in the amount of 35% of the lost wages. That is the value of those benefits as estimated by the employer. The Government argued that by receiving retirement benefits Mr. Funston has received a portion of that amount already. Since Pennsylvania applies the collateral source rule it would be inappropriate for the Court to reduce the Government's obligation to the Plaintiff on account of any payments he may have received from another source, such as his employer. *Kagarise v. Shover*, 218 Pa.Super. 287, 275 A.2d 855 (1971); *Smith v. United States*, 587 F.2d 1013, 1015 (3d Cir. 1978).

■■■ To determine the value of the lost half of Plaintiff's earning capacity, it is appropriate to calculate the full value of that capacity. Based on the evidence submitted, the Court concludes that that value is fairly arrived at by utilizing a wage rate of $8.76 an hour figured on the basis of a 40-hour, 49-week work year for the rest of Mr. Funston's work life expectancy. An additional 35% for the value of fringe benefits lost is also appropriate. This method of calculation, essentially the one proposed by the Plaintiff, seeks no additional compensation for a loss of productivity as authorized by *Kaczkowski v. Bolubasz*, 491 Pa. 561, 421 A.2d 1027 (1980). Under the rule announced in *Kaczkowski* Plaintiff is entitled to compensation for the effects of future inflation on his earning capacity. *Kac-*

*zkowski* holds that the future effects of inflation are equal, as a matter of law, to future interest rates and offset each other eliminating the need to increase the award and then discount to present value.

The Government objects to this method of calculation for several reasons. Its first argument is that based on the evidence Plaintiff has failed to prove that he has lost any earning capacity. For the reasons indicated above, the Court rejects this proposition.

■■■ The Government's second argument is that Plaintiff failed to prove what his future earning capacity was. This argument is based on the fact that the Plaintiff's exhibits showing the wages of comparably situated employees ended at the end of 1980. From this, the Government raises the specious argument that the Court has no basis on which to determine what Plaintiff's future earning capacity was. It is a reasonable inference for the Court to draw that future wages would be at least the same as those earned in 1980.

The Government also raises several objections to the applicability of *Kaczkowski* to this case. The first of such arguments is that *Kaczkowski* is not applicable to personal injury cases but only to wrongful death actions. This argument is without merit. It is important to note that *Kaczkowski* established two separate principles of law. The first is that in at least wrongful death actions in Pennsylvania a plaintiff is entitled to prove the victim's lost future productivity as a part of the victim's lost earning capacity. *Kaczkowski v. Bolubasz*, 491 Pa. at 581–82, 421 A.2d at 1038. That aspect of *Kaczkowski* is not applicable in this case because the Plaintiff does not seek any award on the basis of lost productivity. It is for this reason that the Government's citation to footnote 19 of *Feldman v. Allegheny Airlines, Inc.*, 382 F.Supp. 1271, 1283 (D.Ct. 1974), *rev'd on other grounds*, 524 F.2d 384 (2d Cir. 1975), is inapplicable. That footnote, which discusses the difference between a wrongful death action and a personal injury action insofar as productivity is concerned and suggests that the reten-

tion of capacity for some non-remunerative pursuits might affect the determination of lost productivity, has no place in this action where the Plaintiff seeks no adjustment because of productivity.

The aspect of *Kaczkowski* that is applicable to this case is the portion of the opinion that discusses the effect of inflation on any lump sum award. Regardless of what the Supreme Court of Pennsylvania may decide as to the applicability of the productivity aspect of *Kaczkowski* to personal injury actions, the Court sees no reason why it would not adopt the total offset approach in such actions. The reasoning for that approach is that it is appropriate to assume that future inflation will offset any return brought by the investment of the award and that in order for the plaintiff to be fully compensated, he must not be required to bear the effects of inflation. The effect of inflation on a lump sum award and the relationship of inflation to interest rates is the same regardless of whether the lost earnings are those of a deceased person or of one who is alive but disabled. For that reason, it is required under the law of Pennsylvania to apply the total offset approach of *Kaczkowski* to this case.

The Government's second argument why *Kaczkowski* cannot be applied in this case is that to do so would violate 28 U.S.C. § 2674. That section provides that the United States shall be liable in a case such as this "to the same extent as a private individual under like circumstances, but shall not be liable for . . . punitive damages." The Government takes the position that the failure to discount the award for lost future earning capacity to present value constitutes punitive damages.

■ The Court agrees with the Government that the determination whether damages are punitive is a matter of federal law to be determined by examining the effect of the award rather than its label. *Felder v. United States*, 543 F.2d 657, 669 (9th Cir. 1976); *D'Ambra v. United States*, 481 F.2d 14, 17 (1st Cir.), *cert. denied*, 414 U.S. 1075, 94 S.Ct. 592, 38 L.Ed.2d 482 (1973). The cases relied on by the Government to show

that the failure to discount to present value constitutes punitive damages are not persuasive. None of these cases involved increasing the award because of inflation. *Kaczkowski* does not provide plaintiff with a windfall. Implicit in the holding of that case is the belief that had the victim been able to continue working, his income would rise at least partially with inflation and that the discounting of the award without first increasing it because of inflation prevents the Plaintiff from enjoying that benefit. It is therefore clearly compensatory to the injured party to require the defendant to provide the measure of protection against inflation that was lost by the destruction of the injured party's earning capacity. It is for this reason that it is not punitive to include the effects of inflation in calculating the amount of the award. The total offset approach by equating the rate of inflation to future interest rates in determining the final amount of the award rather than first increasing the award and then commuting the figure to present value is a reasonable method by which to accomplish this compensatory goal and is not punitive.

■ The Government also appears to be arguing that the collateral source rule should not be applied in this case because it results in punitive damages. The Government cites no case so holding and as recently as the case of *Smith v. United States*, 587 F.2d 1013 (3d Cir. 1978), the Court of Appeals for this circuit recognized that the Pennsylvania collateral source rule was applicable to claims under the Federal Tort Claims Act. Therefore, to the extent that the Government is arguing that the collateral source doctrine is prohibited by 28 U.S.C. § 2674, the Court rejects that argument.

■ The Government also advances a more specific argument related to the collateral source rule. It argues that any award for future lost earning capacity must be reduced to reflect the fact that the award in this case is exempt from federal income tax under 26 U.S.C. § 104(a)(2) whereas if Mr. Funston were to have

earned that money he would have to pay federal tax on it. The Court of Appeals for the Third Circuit has not addressed the issue although in *Feeley v. United States*, 337 F.2d 924, 934 (3d Cir. 1964), the Court held that benefits received in a Veterans Administration hospital free of charge by the plaintiff could not again be compensated in an award under the Federal Tort Claims Act. To do so, the Court reasoned, would constitute a double recovery because in such a case the plaintiff having received the value of such services from the general revenue of the United States cannot be permitted to receive in the form of a tort claim award the same compensation.

In *Smith v. United States*, 587 F.2d 1013 (3d Cir. 1978), the Court of Appeals held that social security benefits were from a collateral source because they came from a separate fund and not the general treasury of the United States. As a result, the plaintiff's award under the Federal Tort Claims Act was not reduced by any social security benefits received.

In *Felder v. United States*, 543 F.2d 657 (9th Cir. 1976), the Court of Appeals for the Ninth Circuit held that the damage award must be reduced to account for the fact that the award is tax free. That decision insofar as it relies on the fact that in a Federal Tort Claims Act case Plaintiff's federal income tax benefit is not from a collateral source but from the Defendant, is persuasive. The Court, however, need not decide whether a reduction in the award on account of its tax free status is required in this case.

The Government has not contended that the award on account of earnings lost prior to the time of trial must be reduced because of the fact that the award is free from federal income taxes. Even if such a reduction were sought, it would be denied because of the failure to present evidence as to the appropriate reduction. None of the cases cited by the Government relating to reduction of awards because of income taxes discusses which party has the burden of producing evidence to show the proper reduction. The Court concludes that the burden rests on the Government because it is the party seeking to reduce the Plaintiff's award. Cf. *Vizzini v. Ford Motor Company*, 569 F.2d 754, 756, 762 (3d Cir. 1977). (Defendant sought to prove tax consequences).

The only evidence relating to Mr. Funston's past tax liabilities was a plaintiff's exhibit that showed the amount of tax withheld from his salary. No evidence was presented by the Government as to Mr. Funston's gross income, his adjusted gross income or his taxable income. In the absence of any evidence showing those figures, the Court is not in a position to resort to 26 U.S.C. § 1 to determine the appropriate tax.

The Government's failure of proof is even more pronounced with respect to future earnings. The only evidence on that issue is a schedule that shows the deduction from gross wages of an employee earning the same hourly rate that Mr. Funston probably would have earned. There was no evidence as to whether that person had gross income, adjusted gross income or taxable income similar to that which Mr. Funston could be expected to have enjoyed in the future had he not been injured. The Court, therefore, concludes that even if a reduction in Plaintiff's award because it is free of federal income tax were appropriate the Government has failed to produce sufficient evidence upon which to base a calculation as to the appropriate reduction.

■ Any tax benefit that may be conferred by the Commonwealth of Pennsylvania is from a collateral source and not a ground to reduce Plaintiff's award.

■ The final element of damages is compensation for the pain and suffering endured and to be endured by the Plaintiff. That award must include not only compensation for physical pain and suffering but also for humiliation, depression, and the loss of enjoyment of life. There is, of course, no formula that a trier of fact can apply to determine the amount of an award for pain and suffering. A substantial award is warranted in this case because of the substantial physical pain and suffering endured by

the Plaintiff and the prospect that such suffering will continue for the rest of his life. In addition, Plaintiff has been forced to abandon a very active and full life for one that consists of what one witness described as "puttering around the house." While the Court has concluded that the Plaintiff still retains the ability to earn a not insubstantial living, he no longer retains the ability to enjoy life in the way he once did. For these reasons, the Court concludes that an award of $200,000.00 for pain and suffering is appropriate.

The award made by the Court in this case will fairly compensate the Plaintiff for his injuries to the extent that money is able to do so. The Court shares Dr. Sutliff's view that Plaintiff is not totally disabled; he retains the ability to work. Plaintiff should take advantage of available counselling and other professional services and attempt to secure employment so that he will regain that esteem and self respect which go with performing a job and contributing to his and his family's support.

IV. Conclusions of Law.

1. The Court has jurisdiction over the subject matter of this action.

2. The United States of America is liable to Paul Funston for medical bills in the amount of $10,310.37.

3. The United States of America is liable to Paul Funston for loss of income from November of 1976 to April 14, 1981 in the amount of $80,360.23.

4. The United States of America is liable to Paul Funston for future lost earning capacity from April 14, 1981 in the amount of $199,339.05.

5. The United States of America is liable to Paul Funston for pain and suffering, in the amount of $200,000.00.

An appropriate order will be entered.