LEEPER, Niles R. and Leeper, Geraldine, his wife

v.

UNITED STATES of America.

Appeal of Niles R. LEEPER.

No. 84–5103.

United States Court of Appeals, Third Circuit.

Argued Sept. 11, 1984.
Decided March 6, 1985.

Adams, Circuit Judge, concurred and dissented with opinion.

Stanley M. Shingles (Argued), Philadelphia, Pa., for appellant.

Frederick E. Martin (Argued), Asst. U.S. Atty., Lewisburg, Pa., for appellee.

Before ADAMS, HIGGINBOTHAM and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

Niles R. Leeper appeals the district court's judgment in his favor on the ground of alleged inadequacy of a $115,905.25 award as damages for injuries he sustained due to an inoculation administered under the National Swine Flu Immunization Program of 1976. ("Swine Flu Act").[1] The court denied Mr. Leeper's motion under Fed.R.Civ.P. 52(b) to increase the amounts awarded for past lost earnings and for pain and suffering. We will reverse the district court's judgment as to lost earnings and affirm as to pain and suffering.

### I.

Appellant and his wife, Geraldine Leeper, brought this action in the United States District Court for the Middle District of Pennsylvania under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671–2680 (1966), as amended by the Swine Flu Act. The complaint, filed on April 22, 1981, sought damages from the United States for injuries due to Guillain-Barre Syndrome,[2]

---

1. Pub.L. No. 94–380, 90 Stat. 1113 (1976) [codified at 42 U.S.C. §§ 247b(j)–247b(*l*) (1976)].

2. A neurologic disease of unknown cause, but probably due to infection with a virus, sensitivity to a virus, or to a perverse immunological reaction of the body to constituents of certain vaccines, resulting in an allergic neuritis (inflammation of nerves) and the destruction of myelin (a fatty substance covering some nerve fibers). * * * It begins with par-

esthesias (sensation of tingling or burning) of the feet, followed by paralysis of the legs, which ascends to the trunk, arms, and face. The paralysis is of the flaccid (soft, relaxed) type, and it is attended by absent or lessened tendon reflexes.... Paralysis of the respiratory muscles is the most serious complication. Therefore, treatment must anticipate the possible need for a respirator. Vasomotor failure (failure to sustain an adequate blood pres-

which Niles Leeper allegedly sustained following a swine flu inoculation. Prior to trial, the district court dismissed the complaint as to Geraldine Leeper's claim for alleged loss of consortium because she failed to file a timely administrative claim as required by 28 U.S.C. § 2675(a) (1966). The parties stipulated, however, that the Guillain-Barre Syndrome was caused by the swine flu vaccine and that the government was liable to Mr. Leeper. The non-jury trial thus proceeded solely on the issue of damages. On September 29 and November 1, 1983, the appellant presented evidence which we summarize below.

On December 8, 1976, Niles Leeper, who was then a Postmaster for the United States Postal Service, received a swine flu inoculation from a person authorized under the Swine Flu Act to administer the vaccine. About two weeks later, he suffered an unusual and severe pain in his back, followed by tingling and the loss of sensation and muscle control in his feet. On December 27, 1976, a local orthopedic surgeon examined Mr. Leeper and referred him to Geisinger Medical Center. The examining physician at that hospital diagnosed the appellant as having Guillain-Barre Syndrome and admitted him for treatment.

After his admission to the hospital, Mr. Leeper suffered a steady progression of ascending paralysis and intensification of pain. He lost control over all his muscles. On January 2, 1977, Mr. Leeper's attending physicians feared that he might become unable to breathe without mechanical assistance. They moved him into the Intensive Care Unit for constant observation in case of respiratory failure. By the next day, the paralysis had ascended to appellant's facial muscles and he was in extreme pain. Mr. Leeper's fear and anxiety level also increased proportionately with his pain and paralysis. He would not allow himself to sleep for fear he might die, and the sleep deprivation led to hallucinations. He remained in the Intensive Care Unit for several days.

The hospital released appellant on March 11, 1977. On an out-patient basis, he gradually continued to improve. He underwent surgery and was hospitalized from August 7 through 16, 1977, to alleviate a neurogenic bladder condition which was caused by Guillain-Barre Syndrome. On September 19, 1977, he returned to work as Postmaster on a part-time basis.

Although he had returned to work, Mr. Leeper still had symptoms of burning, stinging, and painful feet. Even at the time of trial, he continued to suffer residual symptoms of Guillain-Barre Syndrome, including lack of stamina and patience, uncharacteristic disinterest in social activities, and permanent nerve damage in his feet, causing him to suffer unrelenting and painful paresthesias.

On December 15, 1983, the district court entered judgment in favor of appellant. Mr. Leeper was awarded the following amounts on his claims for damages:

| | |
|---|---|
| 1. Past Medical Expenses | $18,870.84 |
| 2. Lost Earnings and Loss of Earning Capacity: | |
| a. Past Lost Earnings | 0 |
| b. Diminution of Pension Benefits/Lost Sick Leave | 7,988.86 |
| c. Lost Self-Employment Income | 4,045.55 |
| d. Loss of Earnings Due to Early Retirement | 0 |
| e. Future Loss of Earnings and Earning Capacity | 0 |
| 3. Mental and Physical Pain and Suffering: | |
| a. Past | 75,000.00 |
| b. Future | 10,000.00 |
| Total | $115,905.25 |

On December 27, 1983, Mr. Leeper filed a motion pursuant to Fed.R.Civ.P. 52(b) to amend the district court's findings and

sure) may also occur. If the patient survives the acute phase of the disease, the prognosis is good. * * * However, recovery is slow, and may continue for weeks or even months. Recovery is usually, but not invariably, complete. About one in ten patients is left with muscle weakness. And a few patients suffer recurrent attacks of weakness for many years....

2 J.E. SCHMIDT, M.D., ATTORNEYS' DICTIONARY OF MEDICINE AND WORD FINDER G–77 (1984).

judgment as to lost earnings and pain and suffering. The district court denied the motion on February 1, 1984. Mr. Leeper filed a notice of appeal on February 13, 1984.

## II.

### A.

Prior to returning to work, Mr. Leeper utilized his accumulated sick leave, which amounted to $13,155.64 in payments from the Postal Service. If Mr. Leeper had not been ill, he would have received the same amount as salary. The parties stipulated that this use of sick leave during his illness and convalescence also diminished the value of Mr. Leeper's forthcoming pension by $7,988.86. The district court, however, awarded the lost pension benefits due to use of sick leave as the measure of income lost during Mr. Leeper's absence from work and not the $13,155.64 in wages which he claims he also lost during that time. (App. at 217).

In his reconsideration opinion, the district judge explained that "[b]ecause the United States was both tortfeasor and employer, we did not apply the collateral source rule," and therefore did not award the $13,155.64 in alleged lost wages. (App. at 221–22). The gravamen of Mr. Leeper's argument here is that the district court misapplied the law. He contends that under the Pennsylvania collateral source rule, the district court should have awarded him the amounts for the wages as well as the pension benefits which he lost due to his use of sick leave during his bout with Guillain-Barre Syndrome.

■ In FTCA cases, federal courts must use the applicable state law in the computation of non-punitive damages. 28 U.S.C. § 2674. Thus, in determining whether the district court properly awarded appellant only the lost pension benefits on his claim for earnings lost during the course of his illness, the standard of review is whether that court erred in its interpretation and application of Pennsylvania's collateral source rule.

■ Generally, the collateral source rule allows the victim of a tort to recover for damages caused by the tortfeasor regardless of compensation received from other independent or "collateral" sources. *Denardo v. Carneval,* 297 Pa.Super. 484, 444 A.2d 135 (1982). In FTCA cases, where, as here, the government is both the tortfeasor and the employer, there is often uncertainty as to whether the government's payments to the tort victim constitute a collateral source. "The application or nonapplication of the rule encompasses many different situations and each one must be analyzed separately." *Feeley v. United States,* 337 F.2d 924, 927–28 (3d Cir.1964).

### B.

■ The Pennsylvania Supreme Court has held that there can be no recovery for past earnings where there is no actual loss of income. *Antonelli v. Tumolo,* 390 Pa. 68, 132 A.2d 285 (1957). The Pennsylvania court found that the plaintiff in that case suffered no actual loss during his time away from work because he was paid wages out of his sick leave. 390 Pa. at 74, 132 A.2d at 288. Pennsylvania does allow recovery, however, in cases where employees have continued to receive their salaries pursuant to state statutes while disabled and away from work. *Palandro v. Bollinger,* 409 Pa. 296, 186 A.2d 11 (1962); *City of Philadelphia v. Philadelphia Rapid Transit Co.,* 337 Pa. 1, 10 A.2d 434 (1940). The court found such payments to be more in the nature of disability benefits, similar to workmen's compensation, rather than pure salary.

■ A tort victim can also recover lost earnings where there has been an actual loss of income or an employment benefit. *Kagarise v. Shover,* 218 Pa.Super. 287, 275 A.2d 855 (1971). In this case, the defendant was allowed to submit testimony that Kagarise, a school teacher, had received full or partial payments from a sick pay program for ten (10) of the thirty-nine (39) days of work she had missed due to her injuries. The jury apparently deducted the

compensation she received from her award of damages for lost wages. The Superior Court of Pennsylvania held that the collateral source rule had been violated when the trial court allowed the jury to consider this evidence. 218 Pa.Super. at 291, 275 A.2d at 857.

First, the court found the case to be similar to *Palandro* and *City of Philadelphia, supra*, in which employees continued to receive wages in the form of disability or sick payment compensation, as statutory fringe benefits of their jobs. 218 Pa.Super. at 290, 275 A.2d at 856. Second, and presumably in response to *Antonelli*, the court stated:

> [A]ppellant suffered an actual loss for the days she missed from school in the form of a reduction from her accumulated sick leave. If appellant were to miss any more days from school because of sickness or injury, she would not be compensated, though but for the accident her salary would have been continued. If appellant had already missed ten days of her work prior to her injuries, the accident would have caused her to lose all her pay, and appellee would have been liable for that amount. Clearly, whether or not appellant had accumulated sick leave available should not affect appellee's obligation to pay for damages. (citations omitted).

218 Pa.Super. at 291, 275 A.2d at 857. The case was reversed and remanded for a new trial as to damages. *Id.*

In the instant case, then, if Mr. Leeper received collateral compensation from the Postal Service *and* suffered an actual loss of income and/or benefits, state law would allow him to recover the lost earnings and/or benefits. *See Funston v. United States*, 513 F.Supp. 1000, 1008 (M.D.Pa. 1981) (under the collateral source rule, the plaintiff was entitled to fringe benefits in the amount of 35% of his lost wages even though he had already received retirement benefits that satisfied a portion of this amount).[3]

## C.

In cases where the federal government is both employer and tortfeasor, this court has found that the application of Pennsylvania's collateral source rule precludes the government from reducing FTCA recoveries by the amounts of Social Security benefits, *Smith v. United States*, 587 F.2d 1013 (3d Cir.1978), and Medicare payments, *Titchnell v. United States*, 681 F.2d 165 (3d Cir.1982). In the *Smith* case, we held that Social Security benefits were collateral source payments because they came from a special fund supplied almost entirely by employee and employer contributions. 587 F.2d at 1015–18. FTCA recoveries, however, are paid out of the general unfunded treasury. Similarly, in the *Titchnell* case, the court found Medicare Part A and Part B payments to be from a collateral source since the plaintiffs had shown that they contributed to the funds. 681 F.2d at 174–76.

In *Feeley v. United States*, however, this court found that the collateral source rule did not apply to free medical care received at a Veterans Administration hospital. 337 F.2d at 927. Feeley, an employee of the City of Philadelphia who had been injured by a Postal Service truck, received the free care because he was a veteran rated as 50% permanently disabled from a service-connected injury. *Id.* at 926. The district court awarded Feeley "as a part of his damages the reasonable value of the medical care furnished free by the Veterans Administration...." *Id.* This court reversed. We determined that the rule should not apply because Feeley had not paid any amount towards his hospital treatments. We restricted this holding, however, to the specific facts of the case. *Id.* at 933–34.

The government relies in part on the above three cases as well as the *Antonelli* case in support of its argument that the district court properly did not award lost wages to Mr. Leeper. We believe, however, that the instant case falls within the

---

**3.** *Citing Kagarise, supra,* and *Smith v. United States*, 587 F.2d 1013, 1015 (3d Cir.1978).

gray area between the *Smith* and *Titchnell* cases on the one hand and the *Feeley* case on the other. We agree with the government that unlike the *Smith* and *Titchnell* cases, Mr. Leeper can not be said to have financially contributed (in a direct sense) to the Postal Service Fund, from which sick leave is paid. 39 U.S.C. §§ 1005(e), 2003, 2401 (1980). Sick leave, however, is an employment benefit of the Postal Service. U.S. Postal Service, *Employee and Labor Relations Manual* ("*E.L.R.M.*"), § 513 (1982). Earned and unused sick leave accrues, without limitation, to the benefit of full time Postal employees at the rate of four (4) hours for each full bi-weekly pay period. *E.L.R.M.* §§ 513.21, 513.221. In addition, Postal employees may choose to obtain credit for their earned and unused sick leave in the computation of retirement benefits or survivor annuities. *E.L.R.M.* § 513.821. Contrary to the government's position, then, the facts here are also not like those in the *Feeley* case. Rather than receiving a free service from the government, Mr. Leeper continued his income by suffering an actual loss of one of his employment benefits, previously earned sick time off with pay. Thus the situation here is much more similar to *Smith* and *Titchnell* than to *Feeley*.

The facts here are akin to those in *United States v. Gallops*, 207 F.2d 48 (5th Cir. 1953). On appeal, the government in the *Gallops* case sought to deduct the sick and annual leave benefits it had paid during part of the time Gallops did not work due to his injuries. The district court had found that under Georgia's collateral source rule, such benefits could not be deducted from the plaintiff's FTCA recovery. 207 F.2d at 49. The Fifth Circuit affirmed the district court, finding that:

The sick and annual leave payments were not in the nature of gratuities but were on account of accumulation earned by plaintiff previously. These payments were not made as compensation for the particular injuries suffered but because of a pre-existing agreement based upon length of employment.

207 F.2d at 50.

Applying Pennsylvania law, a district court came to the same conclusion. *Joyce v. United States*, 329 F.Supp. 1242 (W.D. Pa.1971), *vacated and remanded on other grounds*, 474 F.2d 215 (3d Cir.1973).[4] The court stated that:

The Government, as an employer, should not be entitled to claim the benefit of this accrued sick leave fund since the employee would receive the amount credited to his record upon retirement. Six Hundred Forty-three (643) hours have been used up which are directly related to the injuries sustained: in other words, but for the accident herein complained of, the plaintiff would have had the benefit of those hours at retirement.

\*   \*   \*   \*   \*   \*

The Government also contends that Pennsylvania law requires that the plaintiff should be denied damages for lost wages because he received his full salary while on sick leave, citing *Antonelli v. Tumolo*. (citations omitted). However, I do not read this case to say that under no circumstances can a plaintiff recover where he has received his full salary. I would agree with the Government's contention that this case would be dispositive of the issue present here if the plaintiff had suffered no actual loss. Plaintiff Joyce had suffered a real loss however because his accrued sick leave has, as indicated above, been diminished.

329 F.Supp. at 1248.[5]

█ We agree with appellant that, under the collateral source rule, his loss of

---

**4.** Joyce had filed a claim under the Federal Employees' Compensation Act ("FECA"), 5 U.S.C. §§ 8101–8193 (1979) (as amended). He had alleged that he sustained his injuries while in the performance of his duties and had begun to receive benefits. This Court found that a substantial question of coverage under FECA existed and that the district court should stay the action pending the outcome of the FECA proceedings. 474 F.2d at 219.

**5.** *Ricciardi v. United States*, 151 F.Supp. 765 (W.D.Pa.1957), which the same district judge decided fifteen (15) years prior to *Kagarise*, *supra*, and *Joyce*, *supra*, is not controlling

earned, accumulated sick leave results in two measures of damages: 1) the diminution in pension benefits due to lost sick leave hours which could have been credited to him upon retirement; and 2) the loss of wages due to sick leave payments which could have been used for another illness not caused by the government. *Joyce,* 329 F.Supp. at 1248. The recovery for diminution in pension benefits does not automatically restore the hours of accumulated sick leave for which Mr. Leeper was paid in lieu of regular wages and which would have been available to him but for his bout with Guillain-Barre Syndrome. Since there is no limitation upon the number of hours which he could accumulate. *E.L.R.M.* § 513.221. Mr. Leeper suffered an actual loss. Both measures of damages should have been awarded. The district court granted the first measure of damages as reflecting the income which Mr. Leeper lost as the result of his illness, but stated that, since it found that the collateral source rule did not apply against the government as both tortfeasor and employer here, an award for past lost earnings would be improper.[6] If the sick leave payments were not from a collateral source, appellant could recover neither the lost pension benefits nor the lost earnings since both are the result of his use of leave. We find, however, that the collateral source rule is applicable here and appellant should receive the $13,155.64 in past lost earnings.

### D.

We are somewhat perplexed by Judge Adams' dissent. He states that, because

Mr. Leeper may never again have occasion to use the sick leave which he used during his disability by Guillain-Barre Syndrome, the district court's refusal to award damages for lost earnings was justified. He proposes an "alternative remedy that would completely compensate plaintiff for his *potential* loss without giving him a possible bonanza: the government should be required to reinstate Mr. Leeper's accumulated sick leave hours." Judge Adams argues that if, in the future, Mr. Leeper does not need this sick leave, the present award of damages would be a "windfall". The proposed "alternative remedy", a remedy which we note the government never proffered to the district court or to this court, would indeed obviate the need to award both the lost wages and the lost pension benefits; as Judge Adams stated so well in his concurring opinion in *Lentino v. Fringe Employees Plans, Inc.,* 611 F.2d 474, 483 (3d Cir.1979), however, "[i]nasmuch as this matter is not squarely before us, and inasmuch as Pennsylvania courts have not addressed it, ... [we] ... think it is unwise for us to do so, ...".[7]

The basic defect of the dissenting opinion is that Judge Adams misconstrues our limited role in formulating the law of damages in FTCA cases. If we were writing on a clean slate, as Pennsylvania legislators or the Pennsylvania Supreme Court, his proposed remedy might seem attractive and appropriate. Since we are a federal appellate court, however, we do not have that luxury. Our role here is to apply the rules of law of the place where the injury occurred.

---

here. Pennsylvania had paid Ricciardi his regular wages during a three month absence from work. 151 F.Supp. at 766–67. The court did not indicate, however, whether any statute relating to disability benefits was involved, or whether Ricciardi had suffered an actual loss of any employment benefit to which he was entitled.

6. The government now appears to contest the district court's award for lost pension benefits due to use of sick leave and to confuse this award with appellant's claim below for future loss of earnings, including pension benefits, as the result of early retirement. The district

court refused to award damages for future benefits and Mr. Leeper has not appealed the denial. Neither did the government file an appeal. Thus we need not discuss the government's arguments on the issue further.

7. This was a legal malpractice diversity case. The court held that, in the absence of any indications to the contrary in Pennsylvania cases, the district judge did not err in refusing to proceed without the assistance of expert testimony as to the relevant standard of care. Judge Adams agreed, however, he felt that the majority went beyond Pennsylvania case law.

Thus, this court is bound by Pennsylvania case law which provides that the collateral source rule applies in situations such as we have here. In short, if Pennsylvania law allows the possibility of a "windfall", "bonanza", or underpayment in personal injury cases, we have no authority to ignore those cases. In view of the *Palandro, City of Philadelphia,* and *Kagarise* cases, we do not know which cases Judge Adams relies upon that suggest our application of the collateral source rule is "thereby yielding an unintended result".[8] Moreover, neither has he directed us to any Pennsylvania court decisions which have even hinted approval of such a remedy as fashioned in his dissent.

In effect, Judge Adams proposes a concept of structured settlements never argued or submitted by the parties. Until such time as Pennsylvania devises some system of annual, monthly, or daily post-judgment distributions of damage awards, that insures the accuracy of the juries' or fact finders' estimations, there will always be the risk of an underpayment or a "windfall". If a windfall occurs here, and we do not have the omniscience to make that determination, it is because of the rules of Pennsylvania personal injury law, which we are obligated to apply.

### III.

The district court's award of damages for pain and suffering was based on factual findings that can not be disturbed unless clearly erroneous. *Wharton-Thomas v. United States,* 721 F.2d 922, 930 (3d Cir. 1983). Appellant argues that, in comparison with other cases of victims who suffered Guillian-Barre Syndrome from swine flu inoculations, the amount of damages he received was grossly inadequate. In particular, he argues that the court did not give sufficient weight to his mental anguish, humiliation, and fear of the recurrence of the paralysis.

Under Pennsylvania law, the district court was bound to consider mental and physical pain, anguish, suffering, inconvenience, disfigurement, humiliation, and loss of enjoyment of life. *McDonald v. United States,* 555 F.Supp. 935, 971 (M.D.Pa.1983). In its initial opinion, the district court found that Mr. Leeper had endured both mental and physical pain. We summarize the court's characterization of his pain and suffering from Guillian-Barre Syndrome as:

1. extremely intense physical, mental, and emotional agony from December 27, 1976 until sometime in January, 1977;
2. substantial from sometime in January through his release from Geisinger Medical Center in March, 1977;
3. a slow process of rehabilitation during which Mr. Leeper experienced additional pain and suffering in August, 1977 from the prostate operation; and
4. relatively minor discomfort and loss of stamina, which may continue the rest of his life, from the time he returned to work in September, 1977.

(App. at 218). Mr. Leeper received $75,000.00 for past, and $10,000.00 for future, pain and suffering. Upon reconsideration, the district court stated that it had carefully considered the facts and that its award of damages was adequate compensation for the injuries appellant sustained. We cannot find that the court below failed to consider any of the above factors or that its findings of fact are clearly erroneous.

Although there is evidence in the record which supports appellant's contentions that the court may have been more impressed with his "remarkable recovery" than his past and continued suffering,

8. By definition, the collateral source rule allows a "windfall" or "bonanza" in some cases, but it is no secret that the method for compensating tort victims is far from an exact science. This is especially true in damage awards for the future results of a prior tort. Such awards are little more than the juries' or fact finders' estimations of the extent of the injury. As an example, a plaintiff could receive a $20,000 award for future medical expenses and, shortly thereafter, miraculously recover. The unused amount of the award would be a "bonanza". We could cite similar situations involving, for example, awards for future pain and suffering.

"[t]he nature of pain and suffering is such that there is no legal yardstick by which to measure accurately reasonable compensation for it...." *McDonald,* 555 F.Supp. at 971 (citations omitted). This court cannot extricate a party from a less than "ideal" result simply because, on the same factual situation, one fact finder tends to be niggardly in the amount awarded, while others might have been more generous. The standard of review of factual findings does not envision an appellate court substituting its findings for that of the district court; rather it allows only an assessment of whether there is enough evidence on record to support such findings, regardless whether different inferences could be drawn. *In re Coordinated Pre-Trial Proceedings in Antibiotic Antitrust Actions,* 676 F.2d 51 (3d Cir.1982).

When parties do not settle their cases and choose to brave the unknown, subjective response of the fact finder to the plaintiff's pain and suffering, they run the risk of either high or low damage awards. In this case, the award was on the low side, but nevertheless short of the parsimony that would constitute reversible error.

### CONCLUSION

For reasons stated in the above opinion, we will therefore reverse the district court's refusal to award damages for past lost earnings and affirm its findings as to pain and suffering.

ADAMS, Circuit Judge, concurring and dissenting.

I agree that the district court's award for pain and suffering should be affirmed. I do not agree, however, with the disposition of Mr. Leeper's claim for lost wages in Part II of the majority opinion. As I have previously stated, I have some doubts about the applicability of the collateral source rule to the type of situation presented in this appeal. *See Titchnell v. United*

*States,* 681 F.2d 165, 176 n. 9 (3d Cir.1982). Nevertheless, I am bound by the prior decisions of our Court in this regard. *See id.* at 165; *Smith v. United States,* 587 F.2d 1013 (3d Cir.1978).

Even if the collateral source rule is binding on us, however, I do not believe that the majority has applied it properly in this case. Under Pennsylvania law, "the victim of a tort is entitled to the damages caused by the tortfeasor's negligence regardless of compensation the victim receives from [collateral] sources." *Denardo v. Carneval,* 297 Pa.Super. 484, 444 A.2d 135, 140 (1982). The purpose of the collateral source rule is to prevent the tortfeasor from escaping the full cost of the injury he has caused or from benefitting from protection procured by the victim through his or her own efforts. The rationale is not to provide a windfall to the victim, even though it might appear that in some cases application of the rule has that effect. If a court must choose between giving a potential benefit either to the victim or the tortfeasor, the former should probably receive the benefit. However, if there is an alternative remedy which makes the victim whole without granting an unnecessary windfall to either party, such a remedy should be employed.[1] This would seem particularly so when the taxpayers must bear the burden of such a windfall.

Mr. Leeper complains that because of the government's alleged negligence he was required to utilize eight months of accumulated sick leave that he otherwise would have retained. This expenditure of sick leave potentially prejudiced Mr. Leeper in two ways: (1) it diminished his pension benefits because the lost sick leave otherwise would have been added to his length of service upon retirement; and (2) it curtailed his accumulated sick leave which he might require for a future illness. The district court did provide compensation for the diminution in Mr. Leeper's pension ben-

---

**1.** The majority has not cited, and I have not found, any Pennsylvania case which holds that given the choice between a remedy which makes the plaintiff whole and another remedy

which potentially gives the plaintiff more than is necessary to compensate him fully, the latter is preferable.

efits. Although I have no quarrel with awarding plaintiff some form of compensation for this loss, as will be discussed *infra.* I believe there is a better way than a present cash award to ensure that Mr. Leeper will receive full credit for his accumulated sick leave.

With regard to the second component of Mr. Leeper's potential loss—the use of the sick leave in case of future illness—the majority will award plaintiff $13,155.64 for "past lost earnings." It is true that but for the government's alleged negligence, Mr. Leeper would have had an additional increment of accumulated sick leave *should he need it.* But any such loss is speculative. Should Mr. Leeper have no occasion to use the eight months of sick leave in the future—for example if he is not ill or if he leaves the service—he will suffer no harm in this regard.

I believe that it is inappropriate to give Mr. Leeper what may very well be a windfall of over $13,000—the value of the sick leave utilized—when there is an alternative remedy that would completely compensate plaintiff for his *potential* loss without giving him a possible bonanza: the government should be required to reinstate Mr. Leeper's accumulated sick leave hours.[2] Thus should Mr. Leeper need the sick leave in the future, it would be available, thereby preventing the government from benefitting from its allegedly tortious act. And if Mr. Leeper never needs the sick days, he will not have received a $13,000 gratuitous payment. Reinstating plaintiff's sick leave hours would also obviate the need to reimburse him at this time for any diminution in pension benefits. Upon retirement, plaintiff would receive full credit in terms of increased length of service for the sick leave hours that were not subsequently utilized. A rule of damages to be effective must give true expression to the realities of the dispute.

Because the majority is awarding a remedy that might very well give plaintiff a windfall whereas there is an alternative remedy that completely compensates him without unduly prejudicing or benefitting either party. I respectfully dissent from this portion of the judgment. Instead, I would vacate and remand with an order to the district court to reinstate Mr. Leeper's accumulated sick leave in lieu of any present cash award for its loss.[3] A court must remain aware of the purpose behind a rule in order to avoid applying it mechanistically and thereby yielding an unintended result. In view of this, I do not believe the Pennsylvania Supreme Court would approve the remedy fashioned by the majority.

---

**2.** I am assuming that the postal service and the federal government are the same entity. *See* 39 U.S.C. § 201 (1982). If the tortfeasor and the employer were separate entities, the suggested remedy would not be appropriate.

**3.** It is not dispositive that neither party has specifically requested the type remedy that I have suggested. Once a proper request for relief is made, the district court has a duty to grant the relief to which a party is entitled, regardless of whether the party specifically requested the particular type or amount of relief. *See* Fed.R.Civ.P. 54(c); *Fitzgerald v. Sirloin Stockade, Inc.,* 624 F.2d 945, 957 (10th Cir.1980); *Francois v. Francois,* 599 F.2d 1286, 1293–94 (3d Cir.1979), *cert. denied,* 444 U.S. 1021, 100 S.Ct. 679, 62 L.Ed.2d 653 (1980); *see generally* 10 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure §§ 2662, 2664 (2d ed. 1983). Moreover, an appellate court has the power to order a district court to grant appropriate relief even if not specifically requested. *See, e.g., Glick v. Campagna,* 613 F.2d 31, 37 & n. 5 (3d Cir.1980) (appellate court remanding for district court to conduct an accounting although plaintiff did not request one).

A remedy not specifically requested is quite different from deciding an issue not properly before the court. The former is appropriate and, as suggested in *Lentino v. Fringe Employee Plans, Inc.,* 611 F.2d 474, 483 (3d Cir.1979) (Adams, J., concurring), the latter may not be.