Donald J. MacDONALD, Plaintiff,

v.

UNITED STATES of America,
Defendant.

No. 3:CV–88–1567.

United States District Court,
M.D. Pennsylvania.

Nov. 22, 1991.

Lewis H. Markowitz, York, Pa., for plaintiff.

Jerome T. Dempsey, Office of Dist. Counsel, Philadelphia, Pa., Robert J. De-Sousa, Asst. U.S. Atty., Chief, Civil Div., Lewisburg, Pa., for defendant.

## MEMORANDUM

McCLURE, District Judge.

## BACKGROUND

This is an action arising under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* (the "FTCA"), and this court has jurisdiction under the provisions of 28 U.S.C. § 1346(b).

Plaintiffs, Donald J. MacDonald and Mary G. MacDonald, his wife, filed a three-count complaint on September 19, 1988, against the United States of America acting through its agency, the Veterans Administration Medical Center at Wilkes-Barre, Pennsylvania.[1] At the VA Medical Center on or about April 2, 1986 plaintiff Donald J. MacDonald ("MacDonald") underwent surgery known as a superficial femoral-anterior tibial reversed saphenous vein reconstruction on his left leg. Mac-Donald claimed that this operation resulted in extreme exacerbation of existing chronic venous insufficiency and has left him incapacitated. As MacDonald was not entitled to a jury trial, 28 U.S.C. § 2402, the court proceeded with a bench trial, bifurcating the issues of liability and damages. On June 28, 1991, the court issued a memorandum and order finding in favor of Mac-Donald as to his claim of lack of informed consent to the surgery asserted in Count II of the complaint.[2] 767 F.Supp. 1295.

On October 29, 1991, the court began a three-day hearing on the issue of damages. On the basis of all the evidence presented, the court makes the following findings of fact.

## FINDINGS OF FACT

1. MacDonald was graduated from Eastern Kentucky University where he was a member of the United States Army ROTC and from which he obtained a bachelor of arts degree and a teacher's certificate in health and physical education.

2. MacDonald was an outstanding athlete in high school, preparatory school and college.

3. MacDonald entered the United States Army as a Second Lieutenant in January 1964 and volunteered for combat duty in Vietnam in January of 1967.

4. MacDonald completed substantial studies toward a master's degree in education while in the United States Army.

5. MacDonald taught military science while in the United States Army at Georgetown University.

6. While in Vietnam in March 1967, as an infantry battalion advisor to the Republic of Vietnam's Army, he was seriously wounded in the legs.

7. In 1969 MacDonald was honorably discharged from the armed services and returned to Scranton where he immediately became employed with Emery Worldwide, initially as a supervisor of the mail room and then about one year later was reassigned to the credit department, which he eventually took over as manager in the early 1970's. Not happy at Emery, he took employment as a letter-carrier with the United States Postal Service in July 1984.

8. In January 1986 MacDonald, having experienced considerable pain in his lower left calf while walking his route, went to the VA Medical Center. He was found to have an arterial occlusion or blockage in his lower left extremity, and consequently on or about April 2, 1986, underwent surgery at the VA Medical Center to correct the occlusion. Dr. Juan DeRojas, a surgeon with the United States Veterans Administration, performed a superficial femo-

---

**1.** Prior to trial the court dismissed plaintiff Mary G. MacDonald's claim for loss of support, consortium and services asserted in Count III of the complaint.

**2.** The court found in favor of the defendants as to the medical malpractice claim asserted in Count I.

ral-anterior tibial reversed saphenous vein reconstruction on MacDonald's left leg.

9. This surgery was performed without MacDonald's informed consent.

10. Although the arterial surgery was successful, in that it restored normal blood flow to the lower left extremity, MacDonald experienced great post-operative swelling in his left leg with subsequent skin breakdown or dermatitis.

11. Although the swelling and dermatitis eventually came under control by virtue of frequent periods of elevation of the leg above the heart, MacDonald has continued to experience great pain in his left leg which has become progressively more severe.

12. The April 2, 1986 arterial surgery was a substantial factor in causing the current pain in MacDonald's left leg.

13. His current pain is unpredictable and severe. Once the pain begins it progressively grows worse and eventually requires rest. Although rare, on a good day he can spend a substantial amount of time on his feet.

14. As a result of this pain MacDonald is unable to return to his past employment as a letter-carrier with the United States Postal Service.

15. Since the fall of 1986, on a volunteer basis, MacDonald has assisted in teaching eighth grade social studies at St. Paul's elementary school in Scranton. During the 1986–87 school year he assisted on a daily basis; however, beginning in the succeeding school year his attendance became less frequent.

16. Currently, and for the past several years, on a volunteer basis, plaintiff has assisted with the coaching of the Scranton Prep football team. MacDonald's primary function is to analyze and break down game films, and although he is not able to demonstrate blocking and other skills of the game, he does attend practices.

17. MacDonald's volunteer efforts, education and past employment indicate that he is not totally disabled. He can work on a part-time basis ten to fifteen hours a week if the employer provides flexible hours allowing plaintiff to rest, go home, or not come in to work depending on his degree of pain on a given day.

18. The Tobyhanna Army Depot provides such employment opportunities for the disabled.

19. MacDonald's life expectancy from January 1, 1992 is 23.116 years.

20. MacDonald's work-life expectancy from January 1, 1992 is 12.370 years.

21. As a result of the arterial surgery, MacDonald will endure great pain and suffering, both physical and mental, for the remainder of his life.

22. MacDonald was hired by the Postal Service on July 21, 1984 as a part-time letter-carrier.

23. He became a full-time employee on July 20, 1985, progressed to salary Step E at the time he was last employed in March of 1986, and would have progressed through the salary steps had he continued his employment with the Postal Service.

24. In 1986, MacDonald received earnings of $11,214 from the Postal Service.

25. When last employed by the Postal Service MacDonald was at salary level Step E and the court accepts the prediction of the government's expert as to MacDonald's probable progression through the salary steps from 1986 through the remainder of his work-life expectancy. (see Appendix).

26. Overtime is assumed to be 6.92% of annual full-time earnings.

27. MacDonald's lost wages, including overtime, from March 1986 to December 31, 1991 are $166,410.

| Year | Earnings |
|---|---|
| 1986 | 24,146 |
| 1987 | 25,398 |
| 1988 | 26,692 |
| 1989 | 28,278 |
| 1990 | 30,197 |
| 1991 | 31,417 |
| Total base salary | 166,128 |
| Plus overtime (6.92%) | 11,496 |
| Total earnings | 177,624 |
| Less 1986 postal income | (11,214) |
| Total lost wages | 166,410 |

28. The total lost wages of $166,410 includes a reduction by the $11,214 MacDonald had already been paid by the Postal Service in 1986.

29. Fringe benefits associated with working as a letter-carrier are 15% of gross wages paid. As a result of his inability to return to his job as a letter-carrier, MacDonald has lost fringe benefits associated with his position in the amount of $24,961 (15% of $166,410).

30. If plaintiff were able to perform his occupation as a letter-carrier for the remainder of his work-life, he would have earned wages, including overtime, of $425,099 from January 1992 until the remainder of his work-life expectancy (15% of $425,099).

| Year | Salary |
|------|--------|
| 1992 | 32,075 |
| 1993 | 32,147 |
| 1994 | 32,147 |
| 1995 | 32,147 |
| 1996 | 32,147 |
| 1997 | 32,147 |
| 1998 | 32,147 |
| 1999 | 32,147 |
| 2000 | 32,147 |
| 2001 | 32,147 |
| 2002 | 32,147 |
| 2003 | 32,147 |
| 2004 | 11,894 |
| | |
| Total salary | 397,586 |
| Overtime (6.92%) | 27,513 |
| | |
| Total lost future wages | 425,099 |

31. If plaintiff were able to perform his occupation as a letter-carrier for the remainder of his work-life, he would have earned fringe benefits valued at 15% of lost future wages or $63,765 from January 1992 until the remainder of his work-life expectancy (15% of $425,099).

32. MacDonald did not, as required by law, seek to mitigate damages by pursuing other employment.

33. If hired at the Tobyhanna Army Depot a person with MacDonald's skills could have earned up to $15,738 annually on a full-time basis in 1989.[3]

34. Assuming 49 work weeks in a year and a 40–hour work week, the aforementioned salary is equivalent to $8.03 per hour.

35. Working an average of 12.5 hours per week for 49 weeks each year MacDonald could have earned approximately $4,918 annually at the Tobyhanna Army Depot.

36. Consequently, MacDonald could have earned $78,688 from 1989 until 2004, the remainder of his work-life expectancy— an annual salary of $4,918 for 16 years. Thus, his award will be reduced by $78,688.

37. Subsequent to the operation, in 1987, MacDonald's VA benefits were increased from 50% to 60% disability.

38. This 10% increase was solely due to the pain caused by the operation from which MacDonald now suffers.

39. Since this would constitute double recovery from the federal government for the same injury, the damages awarded in this case will be reduced by the aggregate amount of the 10% increase from 1987 to 2014, the remainder of MacDonald's life expectancy.

40. The court accepts the calculation of the government's expert as to the amount of money represented by the 10% increase in VA Benefits from 1987 to 2014. Thus, MacDonald's award will be reduced by $44,180.

---

**3.** The government did not provide salary information for employment prior to 1989. Therefore, possible employment prior to this date will not be considered. In addition, no evidence was submitted as to probable future salary increases.

| Year | 10% increase | Year | 10% increase |
|------|--------------|------|--------------|
| 1987 | 1,428 | 2001 | 1,500 |
| 1988 | 1,500 | 2002 | 1,500 |
| 1989 | 1,548 | 2003 | 1,500 |
| 1990 | 1,632 | 2004 | 1,500 |
| 1991 | 1,697 | 2005 | 1,500 |
| 1992 | 1,632 | 2006 | 1,500 |
| 1993 | 1,794 | 2007 | 1,500 |
| 1994 | 1,752 | 2008 | 1,500 |
| 1995 | 1,752 | 2009 | 1,500 |
| 1996 | 1,801 | 2010 | 1,500 |
| 1997 | 1,738 | 2011 | 1,500 |
| 1998 | 1,668 | 2012 | 1,500 |
| 1999 | 1,668 | 2013 | 1,500 |
| 2000 | 1,570 | 2014 | 1,500 |
| TOTAL: 44,180 | | | |

41. Fair compensation for MacDonald's pain and suffering is $125,000.

## DISCUSSION

■ MacDonald's request for damages is limited to compensation for lost past earnings, lost future earnings and pain and suffering. His request for lost earnings is based on the contention that the pain in his left leg, which the court has already determined was legally caused by the April 1986 operation, has rendered him completely disabled for the remainder of his life.

In calculating the appropriate compensation, the Court must determine whether and to what extent there has been "a loss of earning power and of ability to earn money." More is involved than comparing the amount earned before and after the injury. *Mazi v. McAnlis*, 365 Pa. 114, 121, 74 A.2d 108 (1950). The test is whether "the economic horizon of the [Plaintiff] has been shortened because of the injuries ..." *Holton v. Gibson,* 402 Pa. 37, 44 [166 A.2d 4] (1960).

*Funston v. United States*, 513 F.Supp. 1000, 1006 (M.D.Pa.1981). Based on MacDonald's own testimony, evidence of his work history and his current volunteer activities, the court concludes that while Mac-Donald's earning capacity has been significantly impaired it has not been completely extinguished.

Although MacDonald does not retain full flexibility of his left leg and the pain in his leg can become so severe as to require bed rest, MacDonald continues to enjoy full strength and range of motion in his arms and torso. In addition, although plaintiff's pain is severe, it is unpredictable and on rare occasions he can spend a significant amount of time on his feet. Moreover, the court has had the opportunity to observe plaintiff both during a two-week trial in October of 1990 to determine liability and during a three-day hearing on damages in late October 1991. Although MacDonald was in obvious discomfort during these proceedings, as evidenced by the repeated flexing and stretching of his leg, we never had the occasion to excuse him before the daily recess to allow him to return home to rest his leg due to pain.

This is not to say that we find Mac-Donald's complaints of pain incredible. On the contrary, plaintiff is obviously a man whose complaints of pain should not be taken lightly.[4] The court and even the government's experts during the liability phase found his complaints very credible.

---

4. For example, according to the testimony of Phil Angeli, head football coach at Scranton Prep and a teammate of MacDonald's at Eastern Kentucky, while in college MacDonald broke a vertebrae in his neck during football practice, finished practice for the day and did not consider the pain severe enough to seek medical assistance until late that evening. Moreover, after being placed in a neck-brace and told that he would never play football again, he returned the next season and not only won a starting position but was also named to the all-conference team.

However, even with his physical limitations, based on the testimony of Charles Consagra, the government's vocational expert, and John McAndrews, director of civilian personnel at the Tobyhanna Army Depot, the court concludes that there are jobs which MacDonald is capable of performing for which he possesses the necessary skills. Because of MacDonald's age, work history, education and military background there are employers who would make accommodations for his limitations to secure his services even on a part-time basis. One such employer is the Tobyhanna Army Depot. After considering all of the relevant testimony the court concludes that MacDonald is capable of working on a part-time basis for ten to fifteen hours a week.

■ The government contends that damages in an FTCA case must be discounted to present value and that it would be error for the court to rely on state law such as the state law in Pennsylvania which assumes that there is a total set-off between interest and inflation. This is a puzzling argument because the law clearly states that the FTCA defers to state law on the substantive issue of liability as well as on the computation of damages. 28 U.S.C. §§ 2674 and 1346(b).

Nevertheless, in support of this argument, the government cites several cases holding that damage awards should be based on present value and reflect the plaintiff's actual projected stream of income. However, these cases are inapposite because they either did not involve claims under the FTCA, see *Monessen Southwestern Ry. Co. v. Morgan,* 486 U.S. 330, 108 S.Ct. 1837, 100 L.Ed.2d 349 (1988) (FELA claim); *Jones & Laughlin Steel Corp. v. Pfeifer,* 462 U.S. 523, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983) (claim governed by Longshoremen's and Harbor Workers' Compensation Act ("LHWCA")), or, where the claim was brought under the FTCA, the relevant state law was consistent with the actual stream of income theory. See *Col-*

leen v. United States, 843 F.2d 329 (9th Cir.1987) (relying on *Trevino v. United States,* 804 F.2d 1512 (9th Cir.1986), wherein the court stated that although *Jones & Laughlin,* which interpreted section 5(b) of the LHWCA, was not binding in an FTCA case, in the absence of Washington state law to the contrary, it would adopt the *Jones & Laughlin* theory of damages; *Shaw v. United States,* 741 F.2d 1202 (9th Cir.1984) (relying on *United States v. English,* 521 F.2d 63, 75 (9th Cir.1975) wherein after noting that California law requires 1) adjustments to reflect deductions for personal consumption, expenditures and taxes, and 2) discounting to present value, the court held that under California law a trier of fact may take into account the effects of inflation).[5]

Unlike the FTCA cases cited by the government, the relevant state law in the instant matter is neither silent as to the applicability of discounting to present value nor is it consistent with federal law on the issue. The Supreme Court of Pennsylvania has specifically held that, as a matter of law, inflation is offset by interest, thereby negating the need to discount to present value. *Kaczkowski v. Bolubasz,* 491 Pa. 561, 421 A.2d 1027 (1980); see *Barnes v. United States,* 685 F.2d 66, 70 (3d Cir.1982) (in an FTCA case the Third Circuit rejected government's argument that lost future earnings should be discounted to present value because the theory underlying the total offset rule of *Kaczkowski* includes the reduction to present worth). Accordingly, this court will utilize the total offset method of calculating damages as required by Pennsylvania law and approved by the Third Circuit.

■ Similarly, the government argues that MacDonald's award must be reduced to account for the applicable federal, state and local taxes. The government maintains that the relevant stream of income is after-tax wages and benefits. However, once again, cases cited by the government are inapposite because the decisions were governed by federal law, see *Jones & Laughlin Steel Corp. v. Pfeifer, supra,* (LHWCA); *Norfolk & W.R. Co. v. Liepelt,*

**5.** It should be noted that most, if not all, of the FTCA cases cited by the government in support of its actual stream of income argument were

decided by the Ninth Circuit, which favors the theory and has adopted it whenever the relevant state law is silent or ambiguous on the issue.

444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980) (FELA). More persuasively, the government argues that the failure to deduct income taxes from the plaintiff's award amounts to punitive damages which are prohibited by the FTCA. 28 U.S.C. § 2674.

■ The seminal case on this issue is *Felder v. United States*, 543 F.2d 657 (9th Cir.1976). In *Felder*, after concluding that the failure to account for taxes inaccurately reflected a plaintiff's actual future income and doubly sanctioned the government in the amount of the lost taxes, the court stated:

> Since failure to deduct income taxes would result in plaintiffs receiving greater financial support then they would have in the normal course of events, we would consider the effect of such an award to be punitive.
>
> We hold that, in dealing with incomes as large as those involved here ($30,000 to $125,000 per year), failure to deduct income taxes in computing lost earnings would result in an award of punitive damages that is impermissible under the Federal Tort Claims Act.

*Id.* at 670. Although persuasive, *Felder* is not the law in this circuit. Nevertheless, assuming this court were bound by the decision in *Felder*, it would not apply to the plaintiff in this case. Plaintiff's annual salary in this case ranges from $24,146 to $32,147. This salary range is on the cusp of the lower end of the income range specified in *Felder*, and the court holds that the income tax effect of an award based on this salary would not be so great as to constitute punitive damages.[6] Moreover, Pennsylvania law explicitly states that income taxes should not be deducted. *Reuter v. United States*, 534 F.Supp. 731, 733 (W.D.Pa.1982); *Girard Trust Corn Exchange Bank v. Phila. Transportation Co.*, 410 Pa. 530, 538, 190 A.2d 293, 297–98 (1963); see *Nemmers v. United States*, 612 F.Supp. 928, 934 (C.D.Ill.1985) (in determin-

ing damages in an FTCA case, the court applied Maryland law, which specifically precluded the consideration of income taxes).

The court calculated MacDonald's past lost wages up to December 31, 1991, and his future lost wages from January 1, 1992, to May 16, 2004, by using the calculated annual earnings table submitted by the government. The table is intended to reflect MacDonald's probable progression through the United States Postal Service salary steps. The court assumed overtime pay in the amount of 6.92% of total wages. Although MacDonald claims he regularly earned a higher percentage of overtime, this percentage is equal to the highest percentage of overtime earned by a full-time letter-carrier in the Scranton region in the first quarter of 1990.

Fringe benefits were assumed to be 15% of total gross wages, including overtime. MacDonald maintained that fringe benefits should be calculated at 20%, while the government estimate was closer to 10%. Since the court is not entirely convinced as to the accuracy of either estimate, 15% is a fair estimate of the fringe benefits associated with MacDonald's employment as a letter-carrier.

Since the court has found that MacDonald is not completely disabled, his award will be reduced by the amount of money he could have earned in alternative employment. The government produced evidence showing that the Tobyhanna Army Depot, as well as other employers, would make accommodations to allow plaintiff to work on a part-time basis. In calculating the amount of money MacDonald could have earned if he was employed at the army depot, the court assumed an hourly wage of $8.03, extrapolated from evidence indicating that plaintiff could earn $15,738 annually as a full-time employee at the army depot.

■ The Third Circuit has held that the Pennsylvania collateral source rule applies to claims under the FTCA.[7] *Smith v.*

---

**6.** Moreover, when considering the effects of inflation, which would seem to be consistent with the actual stream of income theory favored by the Ninth Circuit, the value of $30,000 in 1976, when *Felder* was decided, was far greater than

the value of $30,000 today. Therefore, the lower end of the income range specified in *Felder* should be adjusted upward accordingly.

**7.** The collateral source rule holds that a wrongdoer must repay all loss inflicted and cannot

*United States*, 587 F.2d 1013 (3d Cir.1978). Accordingly, since social security benefits are funded almost entirely from employer and employee contributions, rather than the government's general revenues, the court will not deduct social security benefits from the plaintiff's award. *Id.* at 1016. However, MacDonald's ten percent increase in VA benefits subsequent to the operation will be deducted from his award. The ten percent increase was solely due to the pain caused by the operation from which MacDonald now suffers. Consequently, since this would constitute double recovery from the federal government for the same injury, the damages awarded in this case will be reduced by the aggregate amount of the ten percent increase from the date of its commencement to 2014, the remainder of MacDonald's life expectancy. See *Kubrick v. United States*, 581 F.2d 1092, 1098 (3d Cir.1978) (in an action under the FTCA, compensation in the form of VA benefits for the very same injury is set-off against the recovery under the FTCA); see also *Molzof v. United States*, 911 F.2d 18 (7th Cir.1990) (plaintiff not entitled to award of future medical expenses for services he was receiving free of charge from the VA).

The damage award is calculated as follows:

| | |
|---|---:|
| Past lost wages | $166,410 |
| Past lost fringe benefits | 24,961 |
| Future lost wages | 425,099 |
| Future lost fringe benefits | 63,765 |
| Pain and suffering | 125,000 |
| VA benefit increase | (44,180) |
| Potential earnings at Toby-hanna | (78,688) |
| **Total Award** | **$682,367** |

An appropriate order will be entered.

## APPENDIX

### CALCULATED ANNUAL EARNINGS

| DATE | STEP | SALARY AT STEP | PERCENT OF YEAR | SALARY SUBTOTAL |
|---|---|---:|---:|---:|
| 01–Jan–86 | E | 23,655 | 0.353424 | 8,360 |
| 10–May–86 | E | 23,718 | 0.038356 | 910 |
| 24–May–86 | F | 23,974 | 0.153424 | 3,678 |
| 19–Jul–86 | F | 24,569 | 0.306849 | 7,539 |
| 08–Nov–86 | F | 24,734 | 0.147945 | 3,659 |
| **TOTAL 1986 SALARY** | | | | **$ 24,146** |
| 01–Jan–87 | F | 24,734 | 0.082191 | 2,033 |
| 31–Jan–87 | F | 24,734 | 0.153424 | 3,795 |
| 28–Mar–87 | G | 24,994 | 0.115068 | 2,876 |
| 09–May–87 | G | 25,306 | 0.191780 | 4,853 |
| 18–Jul–87 | G | 25,812 | 0.230136 | 5,940 |
| 10–Oct–87 | G | 25,812 | 0.076712 | 1,980 |
| 07–Nov–87 | G | 26,020 | 0.150684 | 3,921 |
| **TOTAL 1987 SALARY** | | | | **$ 25,398** |
| 01–Jan–88 | G | 26,020 | 0.079452 | 2,067 |
| 30–Jan–88 | H | 26,288 | 0.268493 | 7,058 |
| 07–May–88 | H | 26,496 | 0.191780 | 5,081 |
| 16–Jul–88 | H | 26,746 | 0.306849 | 8,207 |
| 05–Nov–88 | H | 27,266 | 0.076712 | 2,092 |
| 03–Dec–88 | I | 27,532 | 0.079452 | 2,187 |
| **TOTAL 1988 SALARY** | | | | **$ 26,692** |
| 01–Jan–89 | I | 27,532 | 0.035616 | 981 |

take advantage of payments made by third parties to the plaintiff for the purpose of reducing the amount of the judgment against the wrongdoer.

| DATE | STEP | SALARY AT STEP | PERCENT OF YEAR | SALARY SUBTOTAL |
|------|------|----------------|-----------------|-----------------|
| 14–Jan–89 | I | 27,782 | 0.306849 | 8,525 |
| 06–May–89 | I | 28,135 | 0.191780 | 5,396 |
| 15–Jul–89 | I | 28,435 | 0.230136 | 6,544 |
| 07–Oct–89 | J | 28,703 | 0.076712 | 2,202 |
| 04–Nov–89 | J | 29,140 | 0.158904 | 4,630 |
| **TOTAL 1989 SALARY** | | | | **$ 28,278** |
| 01–Jan–90 | J | 29,140 | 0.071232 | 2,076 |
| 27–Jan–90 | J | 29,440 | 0.345205 | 10,163 |
| 02–Jun–90 | K | 30,699 | 0.153424 | 4,710 |
| 28–Jul–90 | K | 30,799 | 0.430136 | 13,248 |
| **TOTAL 1990 SALARY** | | | | **$ 30,197** |
| 01–Jan–91 | K | 30,799 | 0.068493 | 2,110 |
| 26–Jan–91 | L | 31,336 | 0.498630 | 15,625 |
| 27–Jul–91 | M | 31,608 | 0.432876 | 13,682 |
| **TOTAL 1991 SALARY** | | | | **$ 31,417** |
| 01–Jan–92 | M | 31,608 | 0.065753 | 2,078 |
| 25–Jan–92 | N | 31,876 | 0.460273 | 14,672 |
| 11–Jul–92 | O* | 32,147 | 0.476712 | 15,325 |
| **TOTAL 1992 SALARY** | | | | **$ 32,075** |
| 01–Jan–93 | O | 32,147 | 1 | 32,147 |
| **TOTAL 1993 SALARY** | | | | **$ 32,075** |
| . | | . | | . |
| . | | . | | . |
| . | | . | | . |
| 01–Jan–03 | O | 32,147 | 1 | 32,147 |
| **TOTAL 2003 SALARY** | | | | **$ 32,075** |
| 16–May–04 | O | 32,147 | 0.369987 | 11,894 |
| **TOTAL 2004 SALARY** | | | | **$ 11,894** |

*Step O is maximum.